UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

BUNNY L. STERLING,                :
                                  :
        Plaintiff,                :    No. 1:11-cv-269-jgm
                                  :
        v.                        :
                                  :
MICHAEL J. ASTRUE,                :
Commissioner of Social Security,  :
                                  :
        Defendant.                :
                                  :
_____ :

DECISION ON CROSS-MOTIONS TO EITHER REVERSE OR
AFFIRM THE COMMISSIONER'S DECISION
(Docs. 4, 7)

Plaintiff Bunny L. Sterling, through her attorney, has moved to reverse the Commissioner's decision denying her Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, and the Commissioner has cross-moved for an order affirming the decision. (Docs. 4, 7.) The Commissioner's Motion is granted, Sterling's Motion is denied, and the decision is affirmed for the reasons that follow.

I.  BACKGROUND

    A.  Factual and Procedural History

Ms. Sterling's November 6, 2009 application for Disability Insurance Benefits alleged a disability for back and shoulder disorders beginning February 11, 2009. (Tr. 16, 145-46.) Ms. Sterling claims she suffers from a lumbar disc disorder, bilateral shoulder and hand arthropathy, reactive airway disease,

and, as a result of her pain, depression and sleep disturbance. (Tr. 31-67.) She takes Vicodin and Methocarbam daily for her pain and muscle spasms. Her application was initially denied December 23, 2009, and again denied upon reconsideration on April 2, 2010. (Tr. 76-78, 79-81, 16.) Following a March 17, 2011 administrative hearing at which Sterling testified by video (Tr. 31-67), Administrative Law Judge Paul Martin issued an unfavorable decision on April 8, 2011 finding Sterling capable of performing a range of sedentary work and not disabled under the Medical-Vocational Guidelines. (Tr. 13-30.) On September 2, 2011, the Appeals Council denied Sterling's request for review of the ALJ's decision, and Ms. Sterling filed this motion for review under 42 U.S.C. § 405(g) on November 7, 2011.

In February 2009, Sterling, who is currently 38 years old, was treated at Central Vermont Medical Center for injuries to her right shoulder, wrist, and neck, caused by a fall. (Tr. 304-10.) An x-ray revealed no fractures. (Tr. at 281.) Following an evaluation of her injuries a few days later at Concentra Medical Center, she was diagnosed with cervical, right shoulder, and wrist strain. (Tr. 224.) Sterling was prescribed Flerexil and Vicodin, instructed to use a wrist splint, pursue physical therapy, and ice her injuries. Id.

Following several therapy sessions, Sterling reported to Concentra that her symptoms were improving. (Tr. 220-22.) While

she continued to have difficulties with her shoulder and wrist, her neck and range of motion had improved. (Tr. 220.) Following the exam, Sterling was cleared for work that did not involve lifting over ten pounds or reaching over shoulder level, and the use of her right arm was limited. (Tr. 222.) Treated at Concentra a week later, Sterling reported "some improvement" from therapy, but complained of difficulties with her shoulder, wrist and neck. (Tr. 217-19.) She was cleared for work again, with the same limitations. (Tr. 219.)

A March 2009 MRI revealed some abnormalities with her right shoulder, and a wrist x-ray revealed soft tissue swelling. (Tr. 282-83.) Meeting with Dr. Stuart Williams at Fletcher-Allen Healthcare that same month, Sterling reported that physical therapy increased her shoulder pain. (Tr. 324-25.) Dr. Williams recommended Sterling remain off work and discontinue therapy until her planned meeting with Dr. John Lawlis, an orthopaedic surgeon. Id. Later that March, Dr. Lawlis examined Sterling, reviewed her MRI, and advised her to return to therapy and "work aggressively at range of motion and strength." (Tr. 317.) Dr. Lawlis administered a steroid injection so Sterling could tolerate the pain due to physical therapy. Id. He restricted Sterling from working for six weeks. (Tr. 316.)

Treated twice at Fletcher-Allen in April 2009, Sterling continued to complain of considerable shoulder pain. (Tr. 326-

3

27.) In May 2009, she complained of worsened shoulder pain to Dr. Lawlis. (Tr. 315-16.) Although Sterling requested surgery, Dr. Lawlis indicated shoulder surgery was premature, administered a second steroid injection and encouraged further physical therapy. Id.

In June 2009, Sterling told Dr. Lawlis neither therapy nor steroid injections had been helpful and was anxious for surgical intervention. (Tr. at 314.) Dr. Lawlis agreed to proceed with surgery, which took place July 28, 2009. (Tr. at 242-45.)

Following surgery, Sterling met regularly with Drs. Lawlis and Williams and she reported her shoulder felt "more comfortable" and that she was "pleased with her progress." (Tr. at 312, 332.) In November 2009, she reported steady improvement and did not appear to need pain medication. (Tr. 311.) When she told Dr. Lawlis that Dr. Williams recommended she never return to work, Dr. Lawlis encouraged aggressive physical therapy, and noted that while she could not use her right upper extremity at all, he would defer, regarding other restrictions, to her primary care physician. (Tr. 311.) A few days later, Dr. Williams noted Sterling was there "primarily to talk about her ongoing work disability," and that she reported "quite a bit of discomfort and dysfunction of [the] right shoulder, particularly when she tries to raise [her arm] above 90 degrees." (Tr. 333.) She also complained of reduced sensation in her arm after surgery, back

4

pain, and hand numbness.  Id.  Dr. Williams concluded Sterling was "disabled from working due to bilateral shoulder atropathy and inability to lift regularly over 5 pounds."  Id.

In late December 2009, Sterling told Dr. Williams she had re-injured her shoulder while putting on a boot.  (Tr. 364.)  She was instructed to postpone therapy until she could tolerate a range of motion with less discomfort and to maintain a "gentle range of motion."  Id.

In January 2010, Sterling was treated for the re-injury by a nurse at Associates of Orthopaedic Surgery, and reported it occurred while lifting something out of the car on Christmas eve.  (Tr. 368.)  She received a steroid injection and was scheduled to see Dr. Lawlis.  Id.  In February, she told Dr. Lawlis she had been progressing with the shoulder until she re-injured it while putting on a boot.  Id.  Dr. Lawlis noted the discrepancy between this report and what she had reported in January.  Id.  He suspected a possible tendon tear and ordered an MRI, which showed some abnormalities.  (Tr. 367, 370.)  His report notes that while Sterling reported her primary care physician had given her permanent disability from employment, he was "not certain of the reasons for that."  (Tr. 367.)

In March 2010, Sterling met with Lawlis regarding her MRI results.  (Tr. 365.)  She reported significant functional shoulder limitations and asked for surgical intervention.  Id.

5

Sterling was "not at all interested" in pursuing physical therapy and wanted surgery, which Lawlis did not recommend as a first choice, but did not find unreasonable. (Tr. 365.) The second surgery was not approved by Workman's Compensation, and Sterling did not proceed with it. (Tr. 399.)

Also in March 2010, Dr. Leslie Abramson, a state agency physician, reviewed Sterling's records and concluded she retained the capacity to perform light work, but could only occasionally push, pull or reach in any direction with her right upper extremity. (Tr. 372-79.) Dr. Abramson considered Sterling's obesity in his assessment. (Tr. 374.)

In August 2010, Sterling received a steroid injection at Central Vermont Hospital to address her low back and bilateral leg pain, and reported this significantly reduced her pain for a period of three weeks. (Tr. 416-17, 386, 410.)

In December 2010, Sterling met with Dr. Williams regarding her shoulder and back issues, and to complete her social security disability paperwork. (Tr. 410.) Sterling complained of significant functional limitations, id., and Dr. Williams concluded she could lift up to ten pounds occasionally, could stand or walk between thirty minutes to an hour, and sit up to one hour in an eight-hour work day. (Tr. 404-05.) Dr. Williams stated Sterling had limited ability to push or pull with her

extremities, and that she had significant postural, manipulative, and environmental restrictions. (Tr. 405-07.)

In January 2011, Sterling received a second epidural steroid injection which she reported provided no pain relief. (Tr. 411, 413-14.) A back exam five days later revealed tenderness and Sterling reported feeling uncomfortable in straight-leg testing, although strength and sensation in her legs was normal. (Tr. 411.).

B. ALJ Decision

At step one of the five-step sequential evaluation process for determining disability under 20 C.F.R. 404.1520(a), the ALJ determined Sterling had not engaged in substantial gainful activity between the onset of her disability on February 11, 2009 and through the "date last insured" on March 31, 2010.[1] (Tr. 18.)

At step two, the ALJ found Sterling's right shoulder injury, low back injury, and obesity were severe impairments under 20 C.F.R. 404.1520(c), while her clotting disorder, and her anxiety and panic disorder were not. (Tr. 18-19.)

---

[1] The ALJ noted that under the insured status requirements of sections 216(I) and 223 of the Social Security Act, 42 U.S.C. §§ 416, 423, Sterling's earnings record shows she had acquired sufficient quarters of coverage to remain insured through March 31, 2010, referred to thereafter as "date last insured," and had to establish disability on or before that date to be entitled to disability benefits. (Tr. 16.)

7

At step three, the ALJ concluded that through the date last insured, Sterling's impairments, alone or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (Tr. 20-21.) The ALJ noted the records of Sterling's shoulder and back impairments did not evidence an inability to perform fine and gross movements, or abnormal motor, sensory or reflex function. (Tr. 21.) The ALJ also concluded Sterling's asthma symptoms did not amount to an impairment, and that "there is no evidence that the claimant's obesity has caused additional limitation such that her combination of impairments" meets or equals a listed impairment. Id.

Before proceeding to step four, the ALJ determined Sterling had the residual functional capacity to perform sedentary work after considering "all symptoms," opinion evidence, and assessing Sterling's credibility in light of the objective medical evidence. The ALJ found that while Sterling testified that despite treatment and steroid injections, she continued to experience pain and could only sit for one hour and walk for ten minutes, her statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible, to the extent they were inconsistent with her assessed residual functional capacity.

The ALJ noted Dr. Lawlis, examining her shoulder injury, described "'a dramatic amount of pain behavior and guarding' that was not consistent with her physical examination." (Tr. 23.) When distracted, Sterling had full motion of her shoulder. Id. Following surgery and therapy, Sterling reported improvement until her re-injury. Id. In follow-up treatment, Sterling told Dr. Lawlis she had been given permanent disability from employment by her primary care physician, but Dr. Lawlis noted he was "not certain of the reasons for that." Id. The other medical records, and Sterling's wide ranging activities of daily living, were objective medical evidence supporting the residual functional capacity. (Tr. 24.)

At step four, the ALJ determined that through the date she was last insured, Sterling was unable to perform her past relevant work as a concrete truck driver, home health aide, bus driver or school bus driver, because the past work required a medium level of exertion and thus exceeded her residual functional capacity. (Tr. 24.)

Proceeding to step five, the ALJ concluded that given Sterling's age, education, work experience and residual functional capacity, there were jobs in significant numbers in the national economy which she could have performed. (Tr. 24-25.)

9

Considering the testimony of a vocational expert, the ALJ determined the extent to which Sterling's limitations eroded the unskilled sedentary occupational base, and concluded Sterling could work as a telephone quotation clerk, call-out operator, and alarm monitor. (Tr. 25-26.) The ALJ concluded, therefore, that Sterling was not under a disability between February 11, 2009 and March 31, 2010.

II. ANALYSIS

Ms. Sterling moves to reverse the decision of the Commissioner on four grounds. (Doc. 4.) First, she claims the ALJ did not properly consider the combined effects of her impairments, including the effects of her bilateral hand arthropathy, obesity, and depression, on her severe shoulder and back disorders. Second, she claims the ALJ improperly rejected the opinion of her treating physician. Third, she claims the ALJ improperly found her testimony was not credible. Finally, she claims the ALJ improperly found she was capable of performing work existing in significant numbers in the national economy. As a whole, she claims, there was substantial evidence she was disabled. Id.

In considering the parties' motions, this Court must afford substantial deference to the Commissioner's decision, and limits its inquiry to a "review [of] the administrative record de novo to determine whether there is substantial evidence supporting the

Commissioner's decision and whether the Commissioner applied the correct legal standard." Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). A reviewing court will "reverse an administrative determination only when it does not rest on adequate findings sustained by evidence having 'rational probative force.'" Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 230 (1938)).

### A. The ALJ Properly Considered the Combined Effect of Sterling's Impairments

The ALJ properly considered the combined effect of Sterling's impairments, including her obesity, in determining residual functional capacity, as required by 20 C.F.R. § 404.1523. The ALJ's decision reviews the medical evidence in detail, and expressly addressed the evidence of Sterling's alleged shoulder, back and hip pain, as well as her obesity and anxiety/panic disorder. (Tr. 18-19, 23-24.) In finding several of these impairments severe, the ALJ noted that Sterling "stands 5'3" tall and weighs 216 pounds," and that "Bariatric surgery has been recommended." (Tr. 19-20.) The ALJ also expressly stated "there is no evidence" Sterling's "obesity has caused additional limitations such that her combination of impairments meets or equals the severity" of a listed impairment. (Tr. 21.) The ALJ also expressly concluded that her anxiety/panic disorder was not severe, noting evidence the disorder did not require treatment

11

and that her physician had found it only minimally limited her functioning and mental work activities. (Tr. 19.)

The ALJ's discussion and consideration of Sterling's impairments is legally sufficient. See Sevene v. Astrue, 2:10-cv-302-jmc, 2011 WL 4708793, at *4 (D. Vt. Sept. 15, 2011) ("Where . . . the ALJ's decision identifies each of the claimant's impairments, the decision is 'not vulnerable to . . . reversal'" for failure to consider "all of the claimed impairments in combination.")

    B.   <u>The ALJ Properly Considered the Opinion of Sterling's Treating Physician</u>

The ALJ properly discounted the reliability of a treating physician's opinion because it was based on Sterling's subjective complaints and was unsupported by medical evidence. A treating physician's opinions are given controlling weight if they are well supported by medical findings and are not inconsistent with other substantial evidence. Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); SSR 96-2p; 20 C.F.R. § 404.1527(d)(2). However, an ALJ may discredit a treating physician's opinion if it is based mainly on a claimant's subjective complaints. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (according less weight to treating physician's opinion that was based largely on self-reported subjective complaints and not supported by clinical evidence); Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (declining to accord physician's

12

opinion controlling weight because it relied excessively on subjective complaints rather than objective medical findings).

Here, Dr. Williams, Sterling's treating physician, met with her in December 2010 and was given forms to complete. Sterling reported she had significant limitations, including "constant low back pain" aggravated by walking, bending, and repetitive movement; she could not stay in a position for more than 20-30 minutes and pain prevented her from lifting "more than 5 pounds or so;" and she could not raise her arms above shoulder level. (Tr. 410.) Dr. Williams completed the forms assessing her functional capacity and indicated she could occasionally lift up to ten pounds, could walk or stand between 30 and 60 minutes, and sit up to one hour in a workday. (Tr. 404-05.)

A review of the record indicates the ALJ properly discounted the reliability of Dr. Williams' opinion because it was based on subjective complaints and unsupported by medical evidence. (Tr. 24 (finding "Williams' assessment persuasive" but "not find[ing] objective medical evidence to support the degree of restriction" and stating that "Williams notes in Exhibit 13 that he based his opinion upon the claimant's subjective reports"); see also Ex. 13F (Tr. 404-07) (showing Dr. Williams' responses refer to "patient's reports").) In addition to the fact that Dr. Williams cited only "patient's reports" in support of his assessment, the

13

ALJ noted that the degree of limitation outlined in Dr. Williams' opinion was unsupported by the record. (Tr. 24.)

This Court holds there is substantial evidence the ALJ appropriately discounted Dr. Williams' opinion because it was unsupported by objective medical evidence.

    C.   <u>The ALJ Properly Evaluated Sterling's Credibility</u>

The ALJ also properly discounted Sterling's credibility in light of the medical evidence and Sterling's activity level. "Objective medical evidence 'is a useful indicator'" to assist in assessing "'the intensity and persistence of' an individual's symptoms" and their effects on ability to function. SSR 96-7p; <u>see also</u> 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Objective medical findings "tend to lend credibility to an individual's allegations about pain or other symptoms and their functional effects," and an adjudicator "must consider [objective medical evidence] in evaluating the individual's statements." <u>Id.</u>

Allegations regarding intensity and persistence of pain, however, "may not be disregarded solely because they are not substantiated by objective medical evidence," although the absence of such evidence "is one factor" to be considered "in the context of all the evidence." <u>Id.</u> When statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical

14

evidence, the ALJ must make a credibility finding based on the entire record.

Here, the ALJ ruled that while Sterling was "honest in her presentation," the overall "objective medical evidence fails to support a further reduction in her work capacity beyond the residual functional capacity" of which the ALJ concluded she was capable. (Tr. 22.) Relying on the medical records, Sterling's activity level, and Dr. Abramson's findings, the ALJ concluded Sterling could work, although with limitations. (Tr. 22-24.)

The ALJ relied on more than just Sterling's reported daily activities, which included preparing her son for school, light housework, laundry, simple meal preparation with assistance, food and clothing shopping and spending time with friends. (Tr. 24.) He expressly considered Dr. Abramson's opinion (although he reasoned that additional evidence suggested Sterling was more limited than Dr. Abramson believed), and Dr. Williams' opinion (which he discounted because no evidence supported Sterling's subjective reports or warranted the degree of restriction to Sterling's ability to handle, finger objects, sit, stand or walk). Id. There is sufficient medical evidence in the record supporting the ALJ's credibility determination.

D. The ALJ Properly Found There Was Other Work Sterling Could Perform

The ALJ properly relied on a vocational expert's testimony that there were jobs existing in significant numbers in the

15

national economy that Sterling could perform, based on her residual functional capacity to perform sedentary work, with additional specific limitations.[2] Sterling argues (1) the ALJ improperly relied on Medical/Vocational Guidelines ("GRIDS") when she was affected by non-exertional limitations that should have precluded their use, and (2) the expert testified that the limitations identified in Dr. Williams' opinion would have precluded employment and therefore Sterling should have been found disabled. Both arguments are without merit.

First, the ALJ expressly recognized that when a claimant can meet all the demands of a level of exertion, the GRIDS direct a conclusion. (Tr. 25.) However, given Sterling's significant non-exertional limitations, the ALJ noted that where "a claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a *framework* for decisionmaking," and noted that Sterling's abilities were "impeded by additional limitations." Id. (emphasis added). The ALJ engaged a vocation expert "to determine the extent to which these limitations erode the unskilled sedentary occupational base." Id. The ALJ properly relied on the expert's identification of telephone quotation clerk, call-out operator

---

[2] Those additional limitations are outlined on page 6 of the ALJ's decision. (Tr. 21.)

and alarm monitor occupations, and Sterling does not argue that these occupations are inconsistent with the RFC determination.

Second, as explained above, the ALJ properly declined to adopt Dr. William's conclusions regarding the degree of Sterling's limitations.  Therefore Sterling's argument that she should be found disabled based on Dr. William's assessment fails.  The ALJ, therefore, properly concluded that Sterling could have performed jobs that existed in significant numbers in the national economy.

III. CONCLUSION

For these reasons, Plaintiff's Motion for Order Reversing the Commissioner's Decision (Doc. 4) is DENIED.  The Defendant's Motion for Order Affirming the Commissioner's Decision (Doc. 7) is GRANTED.  The Commissioner's determination that Sterling is not entitled to Social Security disability insurance benefits is hereby AFFIRMED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 29th day of August, 2012.

/s/ J. Garvan Murtha
Hon. J. Garvan Murtha
United States District Judge